IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GREGORY FRANKLIN,                )   No. C 03-0884 CW (PR)
                                 )
            Plaintiff,           )   ORDER GRANTING DEFENDANTS'
                                 )   MOTION FOR SUMMARY JUDGMENT AS
     v.                          )   TO ALL CLAIMS
                                 )
A. LAMARQUE, ET AL.,             )   (Docket no. 98)
                                 )
            Defendants.          )
_____   )

INTRODUCTION

Plaintiff Gregory Franklin, a state prisoner currently incarcerated at California State Prison - Calipatria (Calipatria), brought this pro se civil rights complaint pursuant to 42 U.S.C. § 1983 alleging constitutional rights violations that occurred when he was incarcerated at Salinas Valley State Prison (SVSP).

Defendants move for summary judgment on all claims on the grounds that:  (1) the undisputed evidence shows that they have not violated Plaintiff's constitutional rights and (2) qualified immunity protects them from liability for the acts alleged in the complaint (docket no. 67).  Defendants also allege that Plaintiff's claims arising prior to February 28, 2001 are barred by the statute of limitations.

For the reasons discussed below, Defendants' motion for summary judgment is GRANTED as to all claims.

BACKGROUND

I.   Procedural Background

On February 28, 2003, Plaintiff filed a complaint alleging unconstitutional conditions of confinement at SVSP from August, 1998 through January 27, 2003, the date he signed his complaint

(docket no. 1).

On February 2, 2004, Plaintiff filed an amended complaint (docket no. 9), which the Court reviewed in conjunction with the claims raised in the original complaint.

In an Order dated September 22, 2004, the Court found that Plaintiff had presented three constitutionally cognizable claims for damages, based on the denial of adequate medical care, the denial of adequate fresh air and recreation, and the denial of due process at his disciplinary proceeding, against Defendants Cal Terhune, former Director of the California Department of Corrections (CDC); Edward Alameida, former Director of the CDC; SVSP Warden A. Lamarque; SVSP Captain Antonio Hedgpeth; Lieutenant Ponder; SVSP Physician Morris Hollie, M.D.; SVSP Chief Physician Moss D. Posner, M.D.; and SVSP Dentist Richard Jones, D.M.D. (docket no. 14).  The Court dismissed all other claims.

On May 11, 2006, all Defendants filed a motion for summary judgment (docket no. 98).  On May 2, 2007, Plaintiff filed an opposition to Defendants' motion for summary judgment (docket no. 103).  On June 15, 2007, Defendants filed a reply to Plaintiff's opposition (docket no. 109).

II.  Factual Background

Plaintiff was incarcerated at SVSP from August 20, 1998 until December 18, 2003.  (Papan Decl., Ex. B.)

Plaintiff claims that in September, 1998, one month after he was received at SVSP, he began complaining about his chronic foot condition.  (Compl. at 5.)  Plaintiff alleges that Defendants Hollie and Posner failed to provide him with adequate medical

attention for his condition by denying his administrative appeals, by refusing to approve his foot surgery and by failing to grant his request for a soft shoe chrono, which would allow him to use his own personal tennis shoes at all SVSP activities.

He also alleges that Defendant Jones was deliberately indifferent to his serious medical needs by failing to provide him with a soft food diet after his teeth were extracted.

Plaintiff further alleges that Defendants Alameida, Lamarque, Hedgpeth, and Terhune denied him constitutionally adequate access to fresh air and recreation for various periods of time due to unjustified and ongoing prison lockdowns occurring throughout his incarceration at SVSP from August, 1998 to December, 2003.  He claims that he and other inmates in Facility C were held for twenty-four hours a day in their cells during these lockdowns.

Finally, Plaintiff claims that his due process rights were violated.  On March 16, 2001, Plaintiff received a serious rules violation for his alleged participation in a March, 2001 riot. Plaintiff alleges Defendant Ponder, the hearing officer at the disciplinary proceeding, failed to meet the requirements of finding "some evidence" bearing "some indicia of reliability" before determining that Plaintiff was guilty.

LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

3

Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the Court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The Court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  The burden then shifts to the opposing party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409

4

(9th Cir. 1991), <u>cert. denied</u>, 502 U.S. 994 (1991).  A complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. <u>Celotex</u>, 477 U.S. at 323.

DISCUSSION

I.  Denial of Adequate Medical Care Claims

    A.  Foot Care

        1.  Factual Background

The following facts are undisputed unless otherwise noted.

Plaintiff claims he has been suffering from painful calluses on his feet since childhood.  (Pl.'s Opp'n, Ex. 58.)  He states that his foot problems have been documented by the CDC since July, 1997.  (<u>Id.</u>, Ex. 57.)

On May 1, 1998, Plaintiff was seen by Dr. Shook, a podiatrist at Calipatria.  Plaintiff claims Dr. Shook recommended foot surgery[1] and gave him permission to wear tennis shoes to all prison activities in Calipatria for a year.  Plaintiff was then transferred to SVSP on August 20, 1998.  (<u>Id.</u>, Ex. 59.)

Plaintiff claims he was seen on October 27, 1998, by an SVSP podiatrist, who noted the calluses on his feet but did not recommend surgery. (Pl.'s Opp'n at 50.)

Defendants Hollie and Posner had very limited direct involvement in Plaintiff's medical care.  On February 27, 2002,

---

[1] Defendants claim Dr. Shook's May 1, 1998 progress notes do not include a recommendation for foot surgery. (Mot. for Summ. J. at 17.)  The Court has reviewed Dr. Shook's progress notes; his handwriting is undecipherable.  Therefore, the Court will take the facts in the light most favorable to Plaintiff, who claims that Dr. Shook recommended foot surgery on May 1, 1998.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Plaintiff was seen by Defendant Hollie, who is a physician and not a podiatrist, because Plaintiff claimed to have suffered a twisted ankle.[2]  (Pl.'s Opp'n, Ex. 65.)

On July 17, 2002, Plaintiff filed an inmate appeal requesting immediate medical attention for his foot condition and a soft shoe chrono.  (Id., Ex. 66.)

On July 24, 2002, Plaintiff's appeal was denied at the informal level by Defendant Hollie, who stated:  "Denied.  CDC issues soft shoes that can be worn anywhere except to visiting and to work.  Therefore there is no need for a chrono."  (Id.)  The first formal level of appeal was bypassed.  (Id.)

On September 19, 2002, Plaintiff's appeal was denied at the second level by Defendant Posner, Chief SVSP Physician, who stated:

> You were seen by the podiatrist on 2/22/99.  He prescribed and provided insoles secondary to calluses on both feet.  He also prescribed topical treatment for a period of 14 days.  No other treatment was clinically indicated.
>
> X-rays of both feet done on 2/9/00 at this institution revealed that 'there is no evidence of any acute trauma. The visualized bone and joint structures are normally

---

[2]  In his complaint, Plaintiff claims that when Defendant Hollie examined him, he asked to see a podiatrist and inquired about receiving a soft shoe chrono.  (Compl. at 8.)  However, Plaintiff does not indicate that Defendant Hollie denied his requests.  Instead, Plaintiff merely states that Defendant Hollie failed to "document" his request.  (Id.; Pl.'s Opp'n at 52.)  Nor do Plaintiff's amended complaint or opposition allege that Defendant Hollie denied his requests.  According to the Director's Level Appeal Decision related to Plaintiff's 602 appeal involving his foot problems:  "The appellant claims in March 2002 Dr. Hollie inappropriately denied his request for a new CDC 128C authorizing him to have and wear soft shoes."  (Compl. Ex. 43 ½.)  However, because Plaintiff does not make this claim in this litigation, the Court will not consider Plaintiff's request for surgery and a soft shoe chrono as a basis for a claim against Defendant Hollie.  The Court will only consider the facts surrounding Defendant Hollie's denial of the 602 appeal as part of Plaintiff's claim of a denial of adequate medical care for his chronic foot problem.

developed, with no evidence of abnormality.  The soft tissues are unremarkable.'  In other words, there is nothing wrong with your feet.

You were seen again by the podiatrist on 1/10/00, 2/7/00 and 5/15/00 who found that an injury to you [sic] ankle while playing sports was resolved and no further podiatry care was required. . . .

When interviewed you requested arch supports, soft-soled boots and you indicated that surgery was recommended in 1997.  The x-rays of your feet do not suggest a need for surgery, prescription footwear or any other medical intervention.  Your position that you need soft-shoes is not supported by findings on physical examination or by objective data.  Prescription footwear is not clinically indicated or medically necessary.

(<u>Id.</u>)  Further, he noted that SVSP medical officials "had no record of prior appeals being submitted through either Inmate Appeals Office or through medical services within the past two years regarding this issue." (<u>Id.</u>)  Plaintiff appealed Defendant Posner's response.

Plaintiff's appeal was denied at the Director's Level of Review on November 13, 2002.  (<u>Id.</u>)

On December 18, 2003, Plaintiff was transferred to Calipatria. (Papan Decl., Ex. B.)  Plaintiff received a soft shoe chrono from 2004 through 2007 (Pl.'s Opp'n, Ex. 70-71), and he was approved for foot surgery in January, 2007 (<u>id.</u>, Ex. 72).

In February, 2007, Plaintiff received surgery on his left foot.  (<u>Id.</u>, Ex. 70-72.)

2.  Analysis

Plaintiff claims that Defendants Hollie and Posner were deliberately indifferent to his serious medical needs by not providing him with adequate medical care for his foot problems during his incarceration at SVSP from August 20, 1998 to December 18, 2003.

United States District Court
For the Northern District of California

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997)(en banc).  A determination of "deliberate indifference" involves an examination of two elements:  the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  See McGuckin, 974 F.2d at 1059.

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  Id. (citing Estelle, 429 U.S. at 104).  The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment.  Id. at 1059-60 (citing Wood v. Housewright, 900 F.2d 1332, 1337-41 (9th Cir. 1990)).

A prison official is deliberately indifferent if he or she knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  In order to establish deliberate indifference, a plaintiff must show a purposeful act or failure to act on the part of the defendant and a resulting harm.  See McGuckin, 974 F.2d at 1060; Shapley v. Nevada Bd. of State Prison Commissioners, 766 F.2d 404, 407 (9th Cir.

8

1985).  Such indifference may appear when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which prison officials provided medical care.  See McGuckin, 974 F.2d at 1062.

Taking the facts in the light most favorable to Plaintiff and considering the length of time that he alleges to have suffered from his foot problems along with his claim that the Calipatria physician recommended surgery, the Court finds that he has presented a triable issue of fact as to whether his foot problems involve a "chronic and substantial pain" sufficient to meet the serious medical needs prong of a deliberate indifference claim. McGuckin, 974 F.2d at 1060 (chronic and substantial pain is an indication of a serious need for medical treatment).

Plaintiff alleges that Defendants Hollie and Posner acted with deliberate indifference to his serious medical needs because they denied his administrative appeals and did not grant his requests for surgery and a soft shoe chrono for his foot problems.

Defendants Hollie and Posner denied Plaintiff's appeal because an x-ray conducted by an SVSP physician on February 9, 2000 revealed no need for surgery, prescription footwear, or any other medical intervention.  Plaintiff's disagreement with Defendants Hollie and Posner's findings is insufficient, as a matter of law, to establish deliberate indifference.  See Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981) ("A difference of opinion between a prisoner-patient and prison medical authorities regarding treatment does not give rise to a § 1983 claim.").

Nor does a difference of opinion between doctors at different prisons mean that Defendants Hollie and Posner, who are not

9

podiatrists, were not justified in relying on the podiatrist at SVSP.  <u>See</u> <u>id.</u>

Plaintiff has failed to carry his burden of raising a genuine issue of fact to support his claim that Defendants Hollie's and Posner's actions rose to the level of deliberate indifference to his serious medical needs.  Accordingly, summary judgment is granted as to all claims against Defendants Hollie and Posner.

B.  Medical Diet Claim

1.  Factual Background

The following facts are undisputed unless otherwise noted.

In September, 1998, Defendant Jones first examined Plaintiff. (Jones Decl. ¶ 3, Ex. A.)  Plaintiff complained of a toothache and swollen gums.  He claimed that his teeth needed to be replaced immediately.  Defendant Jones determined Plaintiff had advanced periodontitis, bone loss and an abscess.  Defendant Jones performed an x-ray on Plaintiff's mouth and confirmed that Plaintiff needed to have his teeth extracted.  However, Plaintiff refused to have his teeth extracted.  (<u>Id.</u> ¶ 3, Ex. A.)

On October 26, 1999, Plaintiff returned to see Defendant Jones and "complained that he wanted some teeth to 'chew with,' and his tooth fell out a couple of days ago."  (<u>Id.</u> ¶ 4, Ex. A.)  Defendant Jones noted that Plaintiff had advanced periodontitis and gingivitis, and he recommended that Plaintiff begin the process to get full dentures. (<u>Id.</u> ¶ 3, Ex. A.)  However, Plaintiff informed Defendant Jones that he wanted only partial dentures, which were unavailable at that time.  (<u>Id.</u>, ¶ 4, Ex. A.)  Plaintiff informed Defendant Jones that he would wait until the partial dentures were available.  (<u>Id.</u>)  Plaintiff alleges Defendant Jones promised him a

10

**United States District Court**
For the Northern District of California

soft food diet until he was able to receive his dentures, but Defendant Jones did not provide the diet. (Pl.'s Opp'n at 90-91.)

On January 13, 2000, Defendant Jones again informed Plaintiff that his remaining teeth should be extracted and replaced with a complete set of dentures after his mouth had time to heal. (Id. ¶ 5, Ex. A.) Defendant Jones noted that due to Plaintiff's advanced periodontitis, the limited bone support for his teeth would not fit to anchor or support partial dentures. (Id. ¶ 5, Ex. A.) Defendant Jones states that he told Plaintiff that, if the full extraction were to occur, he would be placed on a liquid diet during the healing phase and while waiting for delivery of the dentures. (Id. ¶ 5, Ex. A.)

Plaintiff claims that Defendant Jones refused to give him a soft food diet if he would not undergo a full tooth extraction. (Pl.'s Opp'n. at 57). Defendant Jones claims that he believed Plaintiff did not need a special diet at the time Plaintiff requested partial dentures. (Jones Decl. ¶ 4, Ex. A.)

On March 28, 2000, Plaintiff's remaining teeth were extracted. (Id. ¶ 8, Ex. B.) Plaintiff was placed on a liquid diet of three cans daily of Resource, a nutritional supplement, for sixty days. (Id. ¶ 8, Ex. B.) However, Plaintiff alleges that he was promised a soft food diet by Defendant Jones from the date of his full tooth extraction until he received his dentures, and that he was not provided with such a diet. (Pl.'s Opp'n at 90-91.)

Also on March 28, 2000, Defendant Jones requested a consultation from an SVSP dietician regarding Plaintiff's nutritional supplements. The dietician recommended that Defendant Jones should not renew Plaintiff's liquid diet once it expired on

11

May 27, 2000.  (Jones Decl., Ex. B)

On April 4, 2000, Defendant Jones instructed Plaintiff to supplement his liquid diet with a selection of soft foods at the prison cafeteria during meal times.  (Id. ¶ 8, Ex. B.)

On April 28, 2000, Plaintiff claimed that he could not get enough soft food in the dining hall.  (Id. ¶ 10, Ex. A.)  Defendant Jones advised Plaintiff that he should see the SVSP dietician for nutritional counseling.  (Id.)

On May 11, 2000, Plaintiff was seen by an SVSP dietician who offered Plaintiff a written list of forty-seven SVSP menu items which could be gummed in their cooked form.  The menu items listed appear cyclically on the SVSP menu.  (Jones Decl., Ex. B.) According to the SVSP dietician, Plaintiff reviewed the list and stated only that he "can't eat the vegetables."  (Id. ¶ 11, Ex. B.) Vegetables comprised less than two percent of the items listed. (Id. ¶ 11, Ex. B.)  Further, the dietician noted that Plaintiff appeared to be adequately nourished and that he was 112% of his ideal body weight.  (Id. ¶ 11, Ex. B.)

On May 27, 2000, Plaintiff's liquid diet was terminated.  (Id. Ex. B.)

On November 3, 2000, Plaintiff was given his new dentures.  He concedes that the fix, appearance and color of his new dentures were acceptable.  (Id. ¶ 15, Ex. A.)

On November 14, 2000, Plaintiff returned to Defendant Jones complaining of pain as a result of his dentures.  Plaintiff was treated and told to return to the clinic if any future problems arose.  (Id. ¶ 16, Ex. A.)

Plaintiff did not seek any additional dental care until

12

United States District Court
For the Northern District of California

January, 2004, when two teeth had fallen out of his dentures.  He was informed that the dentures would have to be sent to the lab for repair and the estimated time of repair was one month.  He claims that he did not want to wait for the repairs.  (Id. ¶ 17, Ex. A.)

In October, 1998, Plaintiff weighed 187 pounds.  (Id. ¶ 3, Ex. B.)  He gained seven pounds and weighed 194 pounds after one year.  (Id. ¶ 4, Ex. A.)  On March 28, 2000, the date of his tooth extraction, he weighed 195 pounds.  (Id. ¶ 8, Ex. A.)  After a month, he lost four pounds.  (Id. ¶ 10, Ex. A.)  He then lost seven more pounds and weighed 184 pounds on November 3, 2000, the date he was given his new dentures.  (Id. ¶ 15, Ex. A.)  Therefore, the record shows that Plaintiff lost a total of eleven pounds from the date his teeth were extracted to the date he was given his new dentures.

2.   Analysis

Plaintiff alleges that Defendant Jones violated the Eighth Amendment by denying him an adequate medical soft food diet after his tooth extraction, thereby causing him to suffer injury because he lost approximately twenty pounds.[3]  Plaintiff alleges that from May 27, 2000, the date the liquid diet expired, through November, 3, 2000, the date he received his dentures, he suffered various ailments related to the denial of a soft food diet.

Defendants do not dispute that Plaintiff was suffering from a serious dental condition; the record indicates that Defendant Jones diagnosed Plaintiff with advanced periodontitis, bone loss and an

---

[3]  Plaintiff does not attach any medical documentation in support of his allegation that he lost "approximately twenty pounds."  As mentioned above, the record shows that he lost eleven pounds altogether.

abscess, that he extracted all of Plaintiff's teeth, and that he was placed on a liquid diet for sixty days.  Plaintiff's dental problem may be characterized as a "chronic and substantial pain" sufficient to meet the serious medical needs prong of a deliberate indifference claim.  See Hunt v. Dental Dep't, 865 F.2d 198, 2000 (9th Cir. 1989)(where the Ninth Circuit recognized dental care as an important medical need of inmates).  However, to establish an Eighth Amendment violation Plaintiff must also provide evidence that Defendant Jones was deliberately indifferent to Plaintiff's serious medical needs or, specifically, his dietary needs.

Plaintiff claims that the sixty-day liquid diet he was given after the extraction, and the soft foods available to him in the cafeteria were insufficient to maintain his body weight until he received his dentures eight months later.

Defendant Jones contends that there is no evidence that he was deliberately indifferent to Plaintiff's dietary needs and therefore no Eighth Amendment violation occurred.  The Court agrees.  The record shows that Defendant Jones prescribed a liquid diet for Plaintiff during the sixty-day period after his teeth were extracted on March 28, 2000.  Plaintiff received three Resource cans each day for sixty days.  During that time and thereafter, soft food was available to him.  He did not lose a substantial amount of weight or fall below his ideal weight.  There is no evidence that his other health complaints were due to insufficient nutrition.  Plaintiff has not presented evidence that the sixty-day liquid diet or the subsequent list of soft food items he was provided was medically unacceptable under the circumstances.  Cf. Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000) (en banc)

14

(summary judgment should not have been granted to defendants where plaintiff presented evidence that prison officials failed and refused to follow doctor's orders for a liquid diet for plaintiff whose mouth had been wired shut to treat a broken jaw).  Thus, Plaintiff has failed to provide evidence regarding an essential element of this claim, and Defendant Jones is entitled to summary judgment as a matter of law.  See Celotex, 477 U.S. at 323.

Accordingly, the Court GRANTS Defendant Jones's motion for summary judgment as to this claim.

II.   Denial of Fresh Air and Recreation

A.   Factual Background

In September, 1998, approximately one month after Plaintiff's arrival at SVSP, the classification committee completed his initial review and housed him at Facility C, Yard 1, a general population housing unit.  (Am. Compl. at 37.)

A Facility C inmate receives five to six hours of yard activity per day, including religious services, work, educational programs, meals, medical services, canteen trips, showers, access to the law library, inmate visits on designated visiting days, and telephone access.  (Muniz Decl., Ex. C, SVSP Operational Procedure (O.P.) 11A.)

During a lockdown, all programs, inmate movement, and activities are suspended pending an investigation of a specific situation or incident.  (Muniz Decl. ¶ 10, Ex. B.)  During the implementation of a modified program, a specific group of inmates in a portion of the facility are affected by a suspension of programs or services.  The designated inmates are not released except as determined by the facility administration on an

15

**United States District Court**
For the Northern District of California

individual, case-by-case basis.  (Muniz Decl. ¶ 6.)  Uninvolved inmates are allowed to attend work assignments unescorted and do not have their privileges restricted.  (Muniz Decl., Ex. B.)  Between 1996 and 2002, Operational Procedure No. 23 (O.P. 23) was used to handle these situations.  (<u>Id.</u>)  Under O.P. 23, prison officials had the option of implementing a total or partial lockdown, a modified program, a suspended program, restricted movement, or a state of emergency.  (<u>Id.</u>)  This condition would be in effect until the facility administration personnel conducted an investigation to determine that it was safe for both inmates and staff to return to a normal program.  (<u>Id.</u>, Exs. A & B.)

On September 14, 1998, a fight between black and white inmates occurred on Facility C, Yard No. 1.  (Plaintiff is African-American.)  A modified program was implemented.  (<u>Id.</u>, Ex. A at MSJ 002.)  On September 19, 1998, Hispanic inmates were involved in a stabbing on Facility C, Yard No. 1.  (<u>Id.</u>, Ex. A at MSJ 008.)  As a result, SVSP officials recommended that the black and white inmate population remain on their current modified program.  (<u>Id.</u>, Ex. A at MSJ 008.)

On October 7, 1998, black and white inmates were involved in a fight with the use of weapons in Facility C, Yard No. 1, resulting in the firing of weapons, including a "Mini 14 and [a] 37 mm." (<u>Id.</u>, Ex. A at MSJ 010.)  As a result of the stabbing involving Hispanic inmates and the multiple fights involving black and white inmates, Facility C, Yard No. 1 remained on a modified program. (<u>Id.</u>, Ex. A at MSJ 008.)

On January 19, 1999, Hispanic inmates were involved in another stabbing assault on Facility C, Yard No. 1.  (<u>Id.</u>, Ex. A at MSJ

16

018.)  As a result of the incident, Facility C inmates remained on a modified program pending further investigation.  (<u>Id.</u>, Ex. A at MSJ 018.)  On February 6 and 26, 1999, a substantial amount of metal was cut out of a cake pan.  In addition, weapon stock was discovered to be missing from Facility C's kitchen and education program.  As a result, all inmate activities were suspended and inmates on Facility C, Yards No. 1 and 2 remained on a modified program.  (<u>Id.</u>, Ex. A at MSJ 023.)

On March 26, 1999, Facility C's status changed to a "partial" lockdown.  As a result, black and white inmates were permitted to use the yard on a rotating basis.  (<u>Id.</u>, Ex. A at MSJ 025.)

On March 28, 1999, a Southern Hispanic inmate on Facility C, Yard No. 1, was stabbed and sustained serious injuries.  As a result, all inmates were placed on lockdown pending investigation of the incident.  (<u>Id.</u>, Ex. A at MSJ 026.)

On April 10, 1999, Facility C, Yard No. 1 inmates were placed on a "partial" lockdown and allowed to use the yard on a rotating basis.  (<u>Id.</u>, Ex. A at MSJ 028.)

On April 29, 1999, Facility C, Yard No. 1 returned to normal programming for all inmates.  (<u>Id.</u>, Ex. A at MSJ 043.)

On May 4, 1999, a Hispanic inmate was stabbed in Facility C, Yard No. 1.  As a result, Facility C, Yard No. 1, Section A was placed on lockdown.  (<u>Id.</u>, Ex. A at MSJ 044.)  On May 10, 1999, all inmates were released to normal programming.  (<u>Id.</u>, Ex. A at MSJ 047.)

On May 11, 1999, two pieces of thirteen inch lever handles were discovered missing from the computer lab in Facility C.  As a result, Facility C was placed on lockdown pending investigation.

17

(<u>Id.</u>, Ex. A at MSJ 048.)

On July 22, 1999, three correctional officers were stabbed by an inmate during a cell extraction in Facility C.  The entire population of Facility C remained on lockdown status.  A state of emergency was declared for Facility C.  (<u>Id.</u>, Ex. A at MSJ 056.)

On September 8, 1999, Facility C began to release a limited number of inmates to the yard.  (<u>Id.</u>, Ex. A at MSJ 096.)  Facility C did not return to normal programming until September 24, 1999. (<u>Id.</u>, Ex. A at MSJ 114.)

Between September 24, 1999 and September 29, 1999, three stabbings occurred in Facility C, Yard No. 2.  (<u>Id.</u>, Ex. A at MSJ 125.)  Facility C was again placed on lockdown and a state of emergency was declared.  (<u>Id.</u>, Ex. A at MSJ 125.)  On October 2, 1999, multiple black inmates were involved in a stabbing on Facility C, Yard No. 1, resulting in an assault on staff and inmates.  (<u>Id.</u>, Ex. A at MSJ 127.)  As a result of the numerous stabbings, Facility C remained on lockdown status and a state of emergency was declared.  (<u>Id.</u>, Ex. A at MSJ 127.)

On December 16, 1999, the facility was returned to normal programming.  (<u>Id.</u>, Ex. A at MSJ 228.)

On January 15, 2000, a stabbing occurred involving white inmates on Facility C, Yard No. 1.  (<u>Id.</u>, Ex. A at MSJ 238.)

On January 17, 2000, a Northern Hispanic inmate was stabbed on Facility C, Yard No. 1.  (<u>Id.</u>, Ex. A at MSJ 238.)  Due to the ongoing pattern of violence using inmate-manufactured weapons, programming was suspended pending a search of all common areas. (<u>Id.</u>, Ex. A at MSJ 238.)  On February 24, 2000, the search was completed and programming was returned to normal.  (<u>Id.</u>, Ex. A at

18

MSJ 255.)

On March 24, 2000, a violent fight occurred between Crips and Bloods gang members at SVSP, resulting in all black inmates being placed on a modified program pending further investigation.  (Id., Ex. A at MSJ 257.)  On April 7, 2000, a black inmate was stabbed in Yard No. 2; therefore, Yards No. 1 and No. 2 remained on a modified program.  (Id., Ex. A at MSJ 266.)  On April 11, 2000, Yard No. 1 was returned to normal programming.  (Id., Ex. A at MSJ 267.)

During the period from July, 2000 through December, 2000, various incidents occurred among the prisoners resulting in Facility C, Yard No. 1 being placed on modified programming.  (Id., Ex. A, MSJ 272 - 299.)

On March 16, 2001, a large scale riot between North and South Hispanic inmates and black inmates resulted in an extremely modified program for prisoners which lasted until February, 2002. (Id., Ex. A at MSJ 357.)  During this period, inmates were allowed out of their cells for showers and yard time, and were escorted to medical visits, normal visits, and library hours.  (Id., Ex. A at MSJ 357.)

From December 1, 2002 to January 13, 2003, there were twenty-seven incidents in Facility C with a majority of the incidents involving weapons.  A search led to the discovery of approximately 100 weapons.  An investigation revealed that different gang factions were working in concert for illegal purposes.  (Id., Ex. A at MSJ 363.)  Consequently, a state of emergency was declared on January 13, 2003 which lasted until January 24, 2003.  (Id., Ex. A at MSJ 363-364.)

From January, 2003 to May, 2003, Facility C was placed on a

19

modified program that permitted inmates on the yard on a rotational basis.  On May 20, 2003, programming was returned to normal.  (Id., Ex. A at MSJ 370.)

On June 24, 2003, another state of emergency was implemented due to a serious assault on a peace officer by the Crips gang members in Facility D.  (Id., Ex. A at MSJ 374.)   All facilities at SVSP were placed on a state of emergency pending a threat assessment, and all recreation activities were suspended.  (Id.) On September 23, 2003, all inmates were allowed to participate in recreation activities.  (Id., Ex. A at MSJ 376.)

On November 12, 2003, all facilities at SVSP were put on lockdown due to another serious assault on a peace officer.  (Id., Ex. A at MSJ 377.)  The lockdown remained in effect pending a threat assessment, and all recreation activities were suspended. (Id.)  On December 16, 2003, all inmates except Northern and Southern Hispanics were returned to normal programming.  (Id., Ex. A at MSJ 385.)

On December 18, 2003, Plaintiff was transferred to Calipatria. (Papan Decl., Ex. B.)

B.   Analysis

Plaintiff alleges that from the beginning of his incarceration at SVSP in August, 1998 to the time he was transferred in December, 2003, he was periodically denied constitutionally adequate access to fresh air and recreation due to unjustified and ongoing prison lockdowns.

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The treatment a prisoner receives in prison

and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993).  In its prohibition of "cruel and unusual punishment," the Eighth Amendment places restraints on prison officials.  See Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).  The Eighth Amendment also imposes duties on these officials, who must provide all prisoners with the basic necessities of life such as food, clothing, shelter, sanitation, medical care and personal safety.  See Farmer, 511 U.S. at 832; DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 199-200 (1989).

Exercise is one of the basic human necessities protected by the Eighth Amendment.  Wilson v. Seiter, 501 U.S. 294, 304 (1991). "[T]he denial of fresh air and regular outdoor exercise and recreation constitutes cruel and unusual punishment."  Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) (citing Spain v. Procunier, 408 F. Supp. 534, 547 (N.D. Cal. 1976.))  Some form of regular exercise, including outdoor exercise, "is extremely important to the psychological and physical well being" of prisoners.  See Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979).  Prison officials therefore may not deprive prisoners long-term of regular outdoor exercise.  Id.

The Court construes Plaintiff's claim of a deprivation of fresh air and recreation as a claim of denial of outdoor exercise.

Deprivation of necessities by a prison official violates the Eighth Amendment when two requirements are met:  (1) the deprivation alleged must be, objectively, sufficiently serious, see Farmer, 511 U.S. at 834 (citing Wilson, 501 U.S. at 298), and (2) the prison official possesses a sufficiently culpable state of

United States District Court
For the Northern District of California

mind, see id. (citing Wilson, 501 U.S. at 297).  In determining whether a deprivation of a basic necessity, such as outdoor exercise, is sufficiently serious to satisfy the objective component, a court must consider the circumstances, nature and duration of the deprivation.  See Spain, 600 F.2d at 199.  To satisfy the subjective component, the requisite state of mind depends on the nature of the claim.  In prison-conditions cases, the necessary state of mind is one of "deliberate indifference." See, e.g., Farmer, 511 U.S. at 834 (inmate safety).

In Spain, the Ninth Circuit held that the deprivation of outdoor exercise constituted cruel and unusual punishment where the inmates were confined to continuous segregation for a period of over four years under harsh conditions.  See generally Spain, 600 F.2d at 189.  The plaintiffs were in continuous segregation, spending virtually twenty-four hours a day in their cells.  Id. They had little contact with other people, lived in degrading conditions, and there was an atmosphere of fear and apprehension. Id.  In addition, the prison provided no programs of training or rehabilitation.  Id.

In other cases, the Ninth Circuit has applied Spain's guarantee of outdoor exercise under conditions involving shorter periods.  In Toussaint v. Yockey, the Ninth Circuit upheld a preliminary injunction requiring outdoor exercise where segregation lasted for over one year and the inmates had been confined to their cells for close to twenty-four hours a day.  722 F.2d 1490, 1492-93 (9th Cir. 1984).  In Keenan v. Hall, the Ninth Circuit reversed the district court's grant of the prison official's motion for summary judgment on an inmate's Eighth Amendment claim of a deprivation of

22

United States District Court
For the Northern District of California

outdoor exercise for a six month period.  83 F.3d 1083, 1089-90 (9th Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998).  The Ninth Circuit has found that a deprivation of outdoor exercise for an even shorter six-week period was enough to proceed to trial on an Eighth Amendment claim by inmates in indefinite segregation in Allen v. Sakai, 48 F.3d 1082, 1087-88 (9th Cir. 1994) (affirming district court's denial of summary judgment and finding no qualified immunity in outdoor exercise claim), cert. denied, 514 U.S. 1065 (1995).

On the other hand, the denial of outdoor exercise for security reasons does not violate the Eighth Amendment.  See LeMaire v. Maass, 12 F.3d 1444, 1458 (9th Cir. 1993).  In LeMaire, the Ninth Circuit reversed the district court's post-trial findings that depriving the plaintiff of outdoor exercise during his nearly five year confinement amounted to an Eighth Amendment violation.  Id. The plaintiff in LeMaire had attacked two correctional officers and vowed to attack again; therefore, the court found that restricting his exercise privileges to exercising only within his cell did not meet the subjective requirements for an Eighth Amendment violation because "prison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners from such violent inmates." Id.  Similarly, in Hayward v. Procunier, the Ninth Circuit affirmed the district court's denial of declaratory relief and rejection of an Eighth Amendment claim where the plaintiffs were denied outdoor exercise for five months following a lockdown in response to a "genuine emergency."  629 F.2d 599, 603 (9th Cir. 1980), cert. denied, 451 U.S. 937 (1981).

United States District Court
For the Northern District of California

Defendants contend that they were not deliberately indifferent to Plaintiff's need for outdoor exercise because he fails to show that the lockdowns were unjustified and did not amount to genuine emergencies. Defendants claim that the deprivation of outdoor exercise was a result of the overriding safety and security concerns which led to the lockdowns.

Plaintiff's case is distinguishable from <u>Spain</u>, in which the plaintiff inmates had no "possible rewards or incentives from the state which will give them a semblance of hope for their transfer," <u>id.</u> at 199, under the policies in place at the time of the lockdowns. In <u>Spain</u>, the court found that the plaintiff was entitled to at least one hour of exercise per day, five days a week, "unless inclement weather, unusual circumstances, or disciplinary needs made that impossible." 600 F.2d at 199. However, the court acknowledged that an inmate's entitlement to exercise may be circumscribed because of "unusual circumstances" or "disciplinary needs" which makes such exercise impossible. <u>Id.</u>

Plaintiff's case is more similar to <u>Hayward</u>, where there was no Eighth Amendment violation although the plaintiffs were deprived of outdoor exercise for five months due to a genuine emergency. 629 F.2d at 603. The <u>Hayward</u> court found that a lockdown in response to a genuine emergency was an example of the "unusual circumstances reserved in <u>Spain</u>." <u>Id.</u> Accordingly, although Defendants deprived Plaintiff of recreation and exercise for various periods during his incarceration, their actions may be excused due to the overriding security concerns of the prison at the times in question.

Plaintiff claims that denying him outdoor exercise in some

24

United States District Court
For the Northern District of California

instances was unjustified.  For example, Plaintiff claims the lockdown that occurred as a result of the incident on September 19, 1998, where Hispanic inmates were involved in a stabbing on Facility C, Yard No. 1, was unjustified because the incident did not involve any black prisoners.  However, as noted above, case law dictates that "prison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners from such violent inmates."  <u>Lemaire</u>, 12 F.3d at 1458.  Accordingly, Plaintiff's complaints regarding his inclusion in lockdowns, which he deemed was unjustified because of his lack of involvement in the incidents, are unfounded.

The denial of outdoor exercise for security reasons in the present case does not violate the Eighth Amendment.  The record shows that the lockdowns of Facility C resulted from genuine emergencies.  Further, these measures were temporary and the restrictions were lifted as the prison officials determined that the emergencies dissipated.

Thus, Plaintiff has not made a showing sufficient to survive summary judgment on this claim.  Accordingly, Defendants Alameida, Terhune, Lamarque and Hedgpeth are entitled to summary judgment on Plaintiff's Eighth Amendment claim stemming from the denial of outdoor exercise.

III.  Denial of Due Process at Disciplinary Proceeding

A.  Factual Background

On March 16, 2001, a large scale riot broke out on Facility C yard between black and Hispanic inmates.  Plaintiff was charged with violating Title 15 of the California Code of Regulations

25

United States District Court
For the Northern District of California

§ 3005(c), which prohibits willfully inciting or participating in a riot.

Plaintiff's disciplinary hearing was on May 29, 2001. (Compl., Ex. 66.)  He was found guilty of the violation and assessed a loss of ninety days of credits.  (Compl., Ex. 61.)

On August 13, 2001, Plaintiff filed an inmate appeal requesting dismissal of the rules violation and restoration of his lost credits.  (Id., Ex. 64.)

Plaintiff's appeal was bypassed at the informal and the first formal level of review.  His appeal was denied at the second level of review.  His appeal was granted at the third and final level of review and all credits were restored.[4]  (Id.)

B.  Analysis

Plaintiff claims Defendant Ponder violated his due process rights by convicting him in a disciplinary proceeding based on insufficient evidence as prohibited by the Due Process Clause.

Interests protected by the Due Process Clause may arise from two sources -- the Due Process Clause itself and laws of the States.  See Meachum v. Fano, 427 U.S. 215, 223-27 (1976).  Changes in conditions so severe as to affect the sentence imposed in an

_____

[4] Title 15 of the California Code of Regulations prohibits the assessment of credit forfeiture when the inmate is not provided a written explanation of the extraordinary circumstance preventing a hearing within thirty days after the inmate was provided a copy of the rules violation report.  Cal. Code. Reg. tit. 15, § 3320(f)(4). Defendants note that the reason for the restoration was that the Senior Hearing Officer (SHO) handling Plaintiff's case did not establish in the findings of the hearing that the hearing delay did not prejudice Plaintiff.  The SHO did not document that the delayed hearing did not prejudice the inmate.  Thus, Plaintiff's lost credits were restored.  However, Plaintiff claims that he was unable to transfer to a lower level security prison because of his conviction.  Therefore, the Court does not find his claim moot.

**United States District Court**
For the Northern District of California

unexpected manner implicate the Due Process Clause itself, whether or not they are authorized by state law.  See Sandin v. Conner, 515 U.S. 472, 484 (1995).  Deprivations authorized by state law that are less severe or more closely related to the expected terms of confinement may also amount to deprivations of a procedurally protected liberty interest, provided that (1) state statutes or regulations narrowly restrict the power of prison officials to impose the deprivation, i.e., give the inmate a kind of right to avoid it, and (2) the liberty in question is one of "real substance."  See id. at 477-87.

In addition, even where the discipline imposed is neither so severe as to implicate the Due Process Clause itself, nor does it implicate a state created liberty interest, it nonetheless violates an inmate's right to procedural due process if it is supported by "no evidence."  See Burnsworth v. Gunderson, 179 F.3d 771, 773-74 (9th Cir. 1999) (putting escape conviction supported by no evidence on prisoner's record violates procedural due process rights).

In Superintendent v. Hill, 472 U.S. 445, 454 (1985), the Court held that the revocation of good-time credits does not comport with the minimum requirements of procedural due process in Wolff v. McDonnell, 418 U.S. 539 (1974), unless the findings of the prison disciplinary board are supported by some evidence in the record. The standard for the modicum of evidence required is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced.  See Hill, 418 U.S. at 455.  An examination of the entire record is not required nor is an independent assessment of the credibility of witnesses or weighing of the evidence.  See id.  The relevant question is whether there

is any evidence in the record that could support the conclusion reached by the disciplinary board. See id. The Court reiterated that revocation of good-time credits is not comparable to a criminal conviction and neither the amount of evidence necessary to support such a conviction, nor any other standard greater than some evidence, applies in this context. See id. at 456.

The Ninth Circuit additionally has held that there must be some indicia of reliability of the information that forms the basis for prison disciplinary actions. See Cato v. Rushen, 824 F.2d 703, 704-05 (9th Cir. 1987) (only evidence implicating defendant placed in disciplinary segregation was uncorroborated hearsay statement of confidential informant who had no first hand knowledge of any relevant statements or actions of defendant and whose polygraph test was inconclusive).

Here, Plaintiff claims he was not guilty of participation in the March 16, 2001 riot. However, the record shows that there was some evidence on which Plaintiff was found guilty of participating in this riot involving black and Hispanic inmates.

The record shows that Plaintiff was present at the riot. Further, Plaintiff sustained a contusion to his left eyebrow during the riot. (Compl., Ex. 61.) Thus, there was "some evidence" from which Defendant Ponder's conclusion that Plaintiff was involved in the riot could be deduced, thus satisfying the Due Process Clause. The Court finds that Plaintiff fails to raise a genuine issue of fact that he was denied his due process rights at his disciplinary hearing.

Accordingly, Defendant Ponder is entitled to summary judgment on the claim of denial of due process at the disciplinary hearing

United States District Court
For the Northern District of California

stemming from the March 16, 2001 incident.  <u>See</u> <u>Celotex Corp.</u>, 477

U.S. at 232.

IV.   Qualified Immunity

      In the alternative, Defendants claim that they are entitled to

summary judgment on all claims based on qualified immunity.

      The defense of qualified immunity protects "government

officials . . . from liability for civil damages insofar as their

conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have

known."  <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  The rule

of qualified immunity protects "'all but the plainly incompetent or

those who knowingly violate the law.'"  <u>Saucier v. Katz</u>, 533 U.S.

194, 202 (2001) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341

(1986)).  Defendants may have a reasonable, but mistaken, belief

about the facts or about what the law requires in any given

situation.  <u>Id.</u>  "Therefore, regardless of whether the

constitutional violation occurred, the [official] should prevail if

the right asserted by the plaintiff was not 'clearly established'

or the [official] could have reasonably believed that his

particular conduct was lawful."  <u>Romero v. Kitsap County</u>, 931 F.2d

624, 627 (9th Cir. 1991).  When qualified immunity is asserted in a

motion for summary judgment, a district court must carefully

examine the specific factual allegations against each individual

defendant.  <u>Cunningham v. Gates</u>, 229 F.3d 1271, 1287 (9th Cir.

2000).

      To determine whether a defendant is entitled to qualified

immunity, the court must engage in the following inquiries.  At the

outset, the court must determine whether the plaintiff has alleged

United States District Court
For the Northern District of California

the deprivation of an actual constitutional right.  <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999).  In other words, the court must ask, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  <u>Brosseau v. Haugen</u>, 543 U.S. 194, 197 (2004); <u>Saucier</u>, 533 U.S. at 201.  If this inquiry yields a positive answer, then the court proceeds to determine if the right was "clearly established."  <u>Id.</u>

The inquiry as to whether the right at issue was clearly established must be made in light of the specific context of the case, not as a broad general proposition.  <u>Saucier</u>, 533 U.S. at 202.  "Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."  <u>Hope v. Pelzer</u>, 536 U.S. 730, 741 (2002).  As the Supreme Court has explained, "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."  <u>Id.</u> at 753.  The plaintiff bears the burden of proving the existence of a clearly established right at the time of the allegedly impermissible conduct.  <u>Maraziti v. First Interstate Bank</u>, 953 F.2d 520, 523 (9th Cir. 1992).

If the law is determined to be clearly established, the next question is whether, under that law, a reasonable official could have believed his or her conduct was lawful in the situation confronted.  <u>Act Up!/Portland v. Bagley</u>, 988 F.2d 868, 871-72 (9th Cir. 1993).  If the law did not put the officer on notice that his or her conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  <u>Saucier</u>, 533 U.S. at 202.

Therefore, qualified immunity shields an officer from suit when he or she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.  Id. at 206.  The defendant bears the burden of establishing that his or her actions were reasonable, even though he or she violated the plaintiff's constitutional rights.  Doe v. Petaluma City School Dist., 54 F.3d 1447, 1450 (9th Cir. 1995); Neely v. Feinstein, 50 F.3d 1502, 1509 (9th Cir. 1995); Maraziti, 953 F.2d at 523.

The Court has already found that Defendants' actions did not rise to the level of a constitutional violation as to any of Plaintiff's claims.  However, even if Plaintiff's rights had been violated and his rights were clearly established at the time of the violation, Defendants are entitled to qualified immunity because they have produced sufficient evidence showing that they could have believed that their actions were reasonable in the circumstances of each claim as outlined below.

First, Plaintiff alleges that Defendants Hollie and Posner did not provide him with adequate medical care for his foot problems and that he suffered ongoing pain as a result of their deliberate indifference, constituting a violation of the Eighth Amendment. These Defendants' decision to deny Plaintiff's requests for a soft shoe chrono and surgery was based upon numerous tests and visits with SVSP health care workers.  A reasonable prison official in Defendants Hollie and Posner's position could have thought it was unnecessary to grant Plaintiff's requests for a soft shoe chrono and surgery.  Therefore, Defendants Hollie and Posner are entitled to judgment as a matter of law based on their qualified immunity

31

defense.

Second, Plaintiff alleges that Defendant Jones did not provide him with a special soft food diet, causing him to suffer weight loss and constituting a violation of the Eighth Amendment. Defendant Jones did not prescribe a special soft food diet for Plaintiff; however, reasonable alternatives were available. Defendant Jones provided Plaintiff with a liquid diet for two months following the extraction of his teeth.  Plaintiff was also provided with a list of soft foods available on the SVSP menu to supplement his dietary needs.  Therefore, Defendant Jones is entitled to judgment as a matter of law based on his qualified immunity defense.

Third, Plaintiff alleges that Defendants Alameida, Lamarque, Hedgpeth and Terhune denied him constitutionally adequate access to fresh air and recreation as a result of unjustified lockdowns, constituting a violation of the Eighth Amendment.  Plaintiff has not shown that Defendants' behavior was unreasonable from the perspective of a prison official in that situation.  A reasonable prison official in Defendants' position could have thought the lockdowns were justified due to the number of violent incidents that occurred at SVSP during Plaintiff's incarceration and the need for the protection of prison officials and inmates.  Therefore, Defendants Alameida, Lamarque, Hedgpeth and Terhune are entitled to judgment as a matter of law based on their qualified immunity defense.

Finally, Plaintiff alleges that Defendant Ponder convicted him of a rule violation based on evidence insufficient to satisfy the Due Process Clause.  A reasonable prison official in Defendant

32

Ponder's position could have thought that Plaintiff's presence at the March, 2001 riot coupled with a contusion to his left eyebrow sustained during the riot showed that there was "some evidence" from which Plaintiff's involvement in the riot could be deduced, thus satisfying the Due Process Clause.  Therefore, Defendant Ponder is entitled to judgment as a matter of law based on his qualified immunity defense.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to all claims (docket no. 98).[5]  The Clerk of the Court shall enter judgment in favor of Defendants, terminate all pending motions, and close the file.

This Order terminates Docket no. 98.

IT IS SO ORDERED.

DATED:    9/20/07

_____
CLAUDIA WILKEN
United States District Judge

---

[5] Because the Court has granted Defendants' motion for summary judgment, it need not address their allegations that Plaintiff's claims arising before February 28, 2001 are barred by the statute of limitations.

33

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

FRANKLIN,

          Plaintiff,

  v.

ALAMEIDA ET AL et al,

          Defendant.

_____/

Case Number: CV03-00884 CW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on September 20, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Gregory A. Franklin
E66269
CA State Prison-Calipatria
P.O. Box 5002
7018 Blair  Rd.
Calipatria,  CA 92233-5002

Julia  Je
Department of Justice
Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco,  CA 94102-7004

Virginia Irene Papan
California Attorney General's Office
455 Golden Gate Avenue, Suite 11000
San Francisco,  CA 94102-7004

Dated: September 20, 2007

          Richard W. Wieking, Clerk
          By: Sheilah Cahill, Deputy Clerk